UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CITIGROUP MORTGAGE LOAN TRUST 2007-AMC3, by U.S. BANK, NATIONAL ASSOCIATION, solely in its capacity as Trustee,<br><br>                Plaintiff,<br><br>                v.<br><br>CITIGROUP GLOBAL MARKETS REALTY CORP.,<br><br>                Defendant. | No. 13 Civ. 2843 (GBD)<br><br>ECF Case |

## MEMORANDUM OF LAW IN SUPPORT OF CITIGROUP GLOBAL MARKETS REALTY CORP.'S <u>MOTION TO DISMISS THE COMPLAINT</u>

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Citigroup Global Markets Realty Corp.*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................... 1

STATEMENT OF FACTS ............................................................. 3

ARGUMENT ............................................................................ 7

I.    U.S. BANK'S CLAIMS ARE BARRED
BY THE STATUTE OF LIMITATIONS................................ 7

    A.    U.S. Bank's Claims for Alleged Breaches
of Representations and Warranties
Are Barred by CPLR § 213(2) ................................ 8

    B.    The Alleged Breach of the Repurchase
Protocol Does Not Extend the Limitations Period............... 10

II.    U.S. BANK HAS FAILED TO PLEAD
ALLEGATIONS SUFFICIENT TO SUPPORT
ITS BREACH OF CONTRACT CLAIMS .............................. 12

    A.    U.S. Bank's Allegations Sound in Fraud ........................ 12

    B.    U.S. Bank Has Failed to Plead Any Factual
Basis for its Breach of Contract Claims
Related to the Non-Noticed Loans................................ 14

    C.    U.S. Bank's Allegations as to the
Noticed Loans Are Similarly Deficient ........................ 15

III.    U.S. BANK'S REMEDIES ARE LIMITED TO
THE AGREED-UPON REPURCHASE PROTOCOL .................. 16

    A.    U.S. Bank Cannot Assert an Independent
Cause of Action for CGMRC's
Purported Failure to Repurchase................................ 16

    B.    U.S. Bank Is Not Entitled to Equitable
Relief in Relation to Unidentified and
Unspecified Additional Claims................................ 20

    C.    U.S. Bank Cannot Enforce an Obligation to
Repurchase Mortgages That No Longer Exist................... 21

        1.    The Agreements Expressly Provide
for the Repurchase of *Mortgages*............................ 21

        2.    The Trust Opted to Recoup Funds
from the Liquidation of Mortgages in
Lieu of Pursuing Repurchase Claims......................... 23

D.      U.S. Bank Is Not Entitled to
        Indemnification from CGMRC ........................................................................... 23

CONCLUSION ................................................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

CASES

*ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2* v.
    *DB Structured Prods., Inc.*,
    965 N.Y.S.2d 844 (Sup. Ct. N.Y. Cnty. 2013) ...................................................................11

*Assured Guar. Corp.* v. *EMC Mortg., LLC*,
    No. 650805/2012, 2013 WL 1442177
    (N.Y. Sup. Ct. N.Y. Cnty. Apr. 4, 2013) .....................................................................18, 20

*Assured Guar. Mun. Corp.* v. *Flagstar Bank, FSB*,
    No. 11 Civ. 2375, 2011 WL 5335566
    (S.D.N.Y. Oct. 31, 2011) .............................................................................................18, 25

*Atlantic Richfield Co.* v. *Interstate Oil Transp. Co.*,
    784 F.2d 106 (2d Cir. 1986)................................................................................................24

*Bear Stearns Mortg. Funding Trust 2007-AR2* v.
    *EMC Mortg. LLC*, No. 6861-CS 2013
    WL 164098 (Del. Ch. Jan. 15, 2013)..................................................................................25

*BNP Paribas Mortg. Corp.* v. *Bank of Am., N.A.*,
    778 F. Supp. 2d 375 (S.D.N.Y. 2011)................................................................................24

*Chemical Bank* v. *Stahl*,
    712 N.Y.S. 2d 452 (App. Div. 2000) .................................................................................19

*Colello* v. *Colello*,
    780 N.Y.S.2d 450 (App. Div. 2004) .................................................................................8, 9

*Cont'l Cas. Co.* v. *Stronghold Ins. Co.*,
    77 F.3d 16 (2d Cir. 1996)...................................................................................................11

*De Lorenzo* v. *Bac Agency Inc.*,
    681 N.Y.S.2d 846 (App. Div. 1998) ..................................................................................18

*DeBlasio* v. *Merrill Lynch & Co.*,
    No. 07 Civ. 318, 2009 WL 2242605
    (S.D.N.Y. July 27, 2009) ...................................................................................................12

*Ely-Cruikshank Co.* v. *Bank of Montreal*,
    615 N.E.2d 985 (N.Y. 1993)................................................................................................8

*Frota* v. *Prudential-Bache Sec., Inc.*,
    639 F. Supp. 1186 (S.D.N.Y. 1986)...................................................................................12

*Hahn Auto. Warehouse, Inc.* v. *Am. Zurich Ins. Co.*,
  967 N.E.2d 1187 (N.Y. 2012) ...................................................................11

*Kinkopf* v. *Triborough Bridge & Tunnel Auth.*,
  764 N.Y.S.2d 549 (N.Y. City Civ. Ct. 2003),
  *rev'd on other grounds*, 792 N.Y.S.2d 291 (App. Term 2004) ...............10

*Lana & Edward's Realty Corp.* v. *Katz/Weinstein P'ship*,
  No. 27958/08, 2010 WL 963564
  (N.Y. Sup. Ct. Kings Cnty. 2010) ...........................................................8, 9

*Landesbank Baden-Württemberg* v.
  *Goldman, Sachs & Co.*,
  821 F. Supp. 2d 616 (S.D.N.Y. 2011) ........................................................15

*Lehman Bros. Holdings, Inc.* v.
  *Evergreen Moneysource Mortg. Co.*,
  793 F. Supp. 2d 1189 (W.D. Wash. 2011) ...............................................9, 10

*Manns* v. *Norstar Bldg. Corp.*,
  771 N.Y.S.2d 438 (App. Div. 2004) .............................................................8

*MASTR Asset Backed Sec. Trust 2006-HE3 ex rel.*
  *U.S. Bank Nat'l Ass'n* v. *WMC Mortg. Corp.*,
  843 F. Supp. 2d 996 (D. Minn. 2012) ....................................................20, 21

*MASTR Asset Backed Sec. Trust 2006-HE3* v.
  *WMC Mortg. Corp.*, No. 11 Civ. 2542, 2012
  WL 4511065 (D. Minn. Oct. 1, 2012) .........................................................23

*Mills* v. *Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993) ......................................................................14

*Nat'l Urban Ventures, Inc.* v. *City of Niagara Falls*,
  910 N.Y.S.2d 615 (App. Div. 2010) ..............................................................7

*Nomura Asset Accept. Corp. Alt. Loan Trust,*
  *Series 2005-S4* v. *Nomura Credit & Capital, Inc.*,
  No. 653541/2011, 2013 WL 2072817
  (N.Y. Sup. Ct. N.Y. Cnty. May 10, 2013) ...................................................11

*In re Rezulin Prods. Liab. Litig.*,
  133 F. Supp. 2d 272 (S.D.N.Y. 2001) ..........................................................12

*Rombach* v. *Chang*,
  355 F.3d 164 (2d Cir. 2004) .......................................................................12

*Structured Mortg. Trust 1997-2* v.
   *Daiwa Fin. Corp.*, No. 02 Civ. 3232, 2003
   WL 548868 (S.D.N.Y. Feb. 25, 2003) ..........................................................................7, 9, 11

*Tenavision, Inc.* v. *Neuman*,
   379 N.E.2d 1166 (N.Y. 1978) ................................................................................................18

*W. 90th Owners Corp.* v. *Schlechter*,
   525 N.Y.S.2d 33 (App. Div. 1988) ..........................................................................................8

*Walnut Place LLC* v. *Countrywide Home Loans, Inc.*,
   948 N.Y.S.2d 580 (App. Div. 2012) ......................................................................................17

**STATUTES**

CPLR § 213(2) ..........................................................................................................................7, 8

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 9(b) ........................................................................... passim

Federal Rule of Civil Procedure 12(b)(6) ......................................................................................1

Defendant Citigroup Global Markets Realty Corp. ("CGMRC") respectfully submits this memorandum of law in support of its motion to dismiss the complaint filed by Plaintiff U.S. Bank, National Association ("U.S. Bank") on April 30, 2013 (the "Complaint"), acting in its capacity as Trustee of Citigroup Mortgage Loan Trust 2007-AMC3, in its entirety and with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

This Action concerns alleged breaches of two inter-related agreements executed in April 2007 for the purposes of securitizing mortgages into a trust, Citigroup Mortgage Loan Trust 2007-AMC3 (the "Trust"), to be overseen and managed by U.S. Bank as trustee.  In late January 2013, some unnamed investor or group of investors purportedly holding certificates issued by the Trust sent letters alleging numerous and extensive breaches of contract as to 1,267 of the loans (the "Noticed Loans") securitized into the Trust and demanded a payment of $348 million to the Trust from CGMRC.  U.S. Bank, as the entity contractually obligated to administer the loans and assert claims for breach of contract, forwarded these letters to CGMRC on the next business day.  This demand for payment was instigated not by U.S. Bank, but by a still as-yet-unnamed investor and is based on a "forensic review" process that both U.S. Bank—and presumably the unidentified investor—have refused to describe at even a basic level.

Upon receiving this letter, CGMRC requested basic information and records in the possession, custody, and control of U.S. Bank for the express purpose of evaluating in good faith the thousands of alleged breaches and determining to what extent CGMRC may be obligated to pay monies to the Trust pursuant to the parties' agreed-upon contracts.  U.S. Bank's response was to file this suit, alleging that CGMRC essentially engaged in a fraudulent scheme to securitize defective mortgages into the Trust.  Throughout its Complaint, U.S. Bank seeks various remedies as to breaches of the Noticed Loans, and further seeks for the first time similar

remedies for potentially thousands of other loans in the Trust that apparently neither U.S. Bank nor the unnamed investors bothered to review or investigate prior to filing suit (the "Non-Noticed Loans").

U.S. Bank's Complaint, in essence, seeks relief in relation to claims asserted by reference to two categories of loans.  First, U.S. Bank demands immediate payment of $348 million with respect to the Noticed Loans.  U.S. Bank's demand is complete and unequivocal, despite its refusal to provide even the barest information to validate its thousands of claims of alleged breach of contract, and despite U.S. Bank's own lack of investigation of these allegations, which were adopted in full and without question from reports submitted by an unknown entity based on a purported review process that the unknown entity refuses to describe. Second, U.S. Bank seeks various forms of equitable relief and speculative damages as to potentially hundreds if not thousands of Non-Noticed Loans based on generalized boilerplate allegations unconnected to the loans in the Trust.  Having failed to identify any actual breaches as to the Non-Noticed Loans, U.S. Bank asserts numerous generalized allegations about those loans in an effort to obtain remedies for loans that it itself has not identified as deficient.

U.S. Bank's breach of contract claims, however, should be dismissed for several independent reasons.  *First*, U.S. Bank's claims are time-barred by the six-year statute of limitations applicable to New York breach of contract claims.  *Second*, U.S. Bank has failed sufficiently to plead its breach of contract claims with the requisite particularity required by Federal Rule of Civil Procedure 9(b) as to both the Noticed Loans and the Non-Noticed Loans. *Finally*, U.S. Bank seeks various forms of relief for CGMRC's alleged breaches that are directly contrary to and would rewrite the terms of the parties' agreement, terms which specifically address the types of breaches alleged by U.S. Bank and prescribe the limited relief available.

For all of these reasons, and those discussed below, U.S. Bank's claims should be dismissed with prejudice.

## STATEMENT OF FACTS

This case concerns contracts executed in April 2007 and allegations that CGMRC breached those contracts at the moment that they were made effective.  Specifically, U.S. Bank alleges breaches of certain representations and warranties made by CGMRC in its role as sponsor of the Trust, a residential mortgage-backed securitization.  CGMRC was first notified of certain potential claims relating to the Trust on January 28, 2013, when it received letters from U.S. Bank as trustee to the Trust.  (*See* Buergel Decl. ¶ 7; Buergel Exs. 3–4.)[1]  The January 28 letters alleged breaches of representations as to 1,267 loans and demanded that CGMRC pay U.S. Bank over $348 million.  (*See* Buergel Decl. ¶¶ 2–3; Buergel Exs. 1–2.)  CGMRC responded three days later, requesting additional information to permit it to review, evaluate, and respond to U.S. Bank's claims.  (*See* Buergel Ex. 5.)  U.S. Bank ignored CGMRC's response, electing instead to commence this litigation on April 30, 2013.

The contracts at issue facilitated the securitization of mortgages into the Trust. Securitization is a multi-step process by which mortgage loans are pooled into a trust and certificates, commonly known as residential mortgage-backed securities ("RMBS"), are issued to investors entitling them to a portion of the income flow generated by the underlying mortgages. In this case, the loans sold into the Trust were originated by non-parties Argent Mortgage Company, L.L.C. and Ameriquest Mortgage Company (the "Originators").  CGMRC purchased the loans from the Originators and then, in the first of two transactions, sold the loans to its non-

---

[1]   All citations in the format "Buergel Decl. ¶ __" are to the Declaration of Susanna M. Buergel in Support of Defendant's Motion to Dismiss the Complaint ("Buergel Declaration").  All citations in the format "Buergel Ex. __" are to the exhibits to the Buergel Declaration.

party affiliate Citigroup Mortgage Loan Trust, Inc. (the "Depositor") pursuant to a Mortgage

Loan Purchase Agreement (the "MLPA").  Simultaneously, the Depositor conveyed the loans to

the Trust pursuant to a separate contract, the Pooling and Servicing Agreement (the "PSA"), in

exchange for approximately $1 billion in certificates that another non-party affiliate, Citigroup

Global Markets Inc., ultimately sold to investors.

      CGMRC and the Depositor are the parties to the MLPA, as seller and buyer of the

mortgages underlying the Trust.  The MLPA is dated April 2, 2007 and provides that CGMRC

would sell the mortgages to the Depositor on or before the closing date of April 30, 2007.

      The parties to the PSA are the Depositor, U.S. Bank, and two other entities,

Ocwen Loan Servicing, LLC (the "Servicer")[2] and Citibank, N.A. (the "Trust Administrator").

The PSA "is dated and effective as of April 1, 2007," and was executed by the parties on April

24, 27, and 30, 2007.  (*See* PSA at 1.)[3]  Each of these entities has specific obligations as set forth

in the PSA.  The Servicer administers the loans to obtain timely payment of principal and interest

from the borrowers and, if necessary, initiates foreclosures and other actions in case of

delinquent or defaulted loans.  (*See id.* § 3.01.)  Among other ministerial duties, the Trust

Administrator calculates and facilitates the payments of funds to certificateholders and issues

regular reports concerning the performance of the loans.  (*See id.* § 4.01.)  As described above,

the Depositor transferred the mortgages acquired from CGMRC to the Trust.

      U.S. Bank, as Trustee, is responsible for the supervision and administration of the

Trust; in that role, U.S. Bank exercises control over the assets in the Trust and supervises the

---

[2]    Litton Loan Servicing LP was the original servicer but was replaced by Ocwen.

[3]    All citations in the format "PSA __" are to the Pooling and Servicing Agreement executed by
the Depositor, Litton Loan Servicing LP, the Trust Administrator, and U.S. Bank, dated as of
April 1, 2007, which is attached to the Complaint as Exhibit 1.  All citations in the format
"MLPA __" are to the Mortgage Loan Purchase Agreement executed by the Depositor and
CGMRC, dated as of April 2, 2007, which is attached to the Complaint as Exhibit 2.

duties and performance of the other parties to the PSA.  In particular, U.S. Bank has access to and control over all available information related to the origination, servicing, and performance of the loans in the Trust.  The Depositor conveys ownership of the mortgages to U.S. Bank, including the origination and servicing files concerning the mortgages, which are owned by the Trust.  (*See id.* § 2.01.)  U.S. Bank as trustee is entitled to review and request on demand any documentation related to the origination and performance of the mortgages in the possession of the Servicer.  (*See id.* § 3.22.)  U.S. Bank also receives monthly reports created by the Trust Administrator detailing the performance of the mortgages, including delinquencies, defaults, foreclosures, and liquidations, (*see id.* § 4.02), and the Servicer also is required to report losses related to the mortgages to U.S. Bank on a monthly basis (*see id*. § 4.04(a)).

The MLPA and PSA operate in tandem with respect to the relief sought by U.S. Bank.  When CGMRC sold the mortgages to the Depositor pursuant to the MLPA, CGMRC made fifty-two representations concerning characteristics of each of the Group II[4] mortgages as of the date of transfer.  (*See* MLPA § 5(a), Ex. A.)  These representations concern a range of issues—everything from representations concerning whether the borrowers committed fraud to highly technical issues, such as the form and requirements for title insurance policies.  (*Compare* MLPA Ex. A ¶ 17 to ¶ 59).  If there is a material breach of these representations, CGMRC must be given notice and an opportunity to cure or repurchase.  (*See* MLPA § 6.)  In turn, the PSA incorporated certain aspects of the MLPA by reference, including the representations made by CGMRC and the requirement to provide CGMRC with notice of and an opportunity to cure or repurchase materially defective mortgages.  (*See* PSA § 2.03(a).)

---

[4]   The loans in the Trust were divided into two groups.  CGMRC made seventeen additional representations as to the loans in Group I that were not made with respect to the Group II loans.  *See* MLPA § 5(b).  U.S. Bank's claims do not concern the Group I loans.

On January 24 and 25, 2013, counsel representing certain unidentified investors in the Trust sent two letters to U.S. Bank, CGMRC, and the other parties to the agreements. (Buergel Exs. 1–2.)[5]  In those letters, the unknown investors alleged breaches of representations and warranties in connection with a total of 1,267 loans, and demanded both that CGMRC cure or repurchase and that U.S. Bank separately notify CGMRC of the alleged breaches.  U.S. Bank forwarded the letters to CGMRC on January 28, 2013, demanding cure or repurchase of the 1,267 loans by April 28, 2013.  (Buergel Exs. 3–4.)  CGMRC promptly responded by letter dated January 31, 2013 (the "January 31 Letter").  (Buergel Ex. 5.)

In the January 31 Letter, CGMRC clearly stated that it was reviewing the issues raised in good faith, but that it needed information concerning the loans, including the factual bases for the alleged breaches, in order to evaluate whether the 1,267 loans suffered from material breaches of the applicable representations and warranties.  (*Id.*)  The January 31 Letter requested in detail specific information in U.S. Bank's possession, custody, and control that would allow CGMRC to assess its obligations in relation to each of the Noticed Loans.  (*Id.*) The letter expressed CGMRC's willingness to engage on the issues with U.S. Bank:  "We therefore appreciate your anticipated cooperation in delivering the documents requested above and discussing these issues further.  We are available at your convenience, and would be happy to answer any questions you might have."  (*Id.* at 3.)  Contrary to the allegations in the Complaint, CGMRC did not deny its contractual obligations to cure or repurchase breaching loans in the January 31 Letter, nor did CGMRC suggest that it would fail to honor its obligations for any loans that in fact have material breaches of representations and warranties.

U.S. Bank did not respond to the January 31 Letter, except to commence this

---

[5]    CGMRC has no record of receiving these letters directly.  (Buergel Decl. ¶ 7.)

Action on April 30, 2013.  In its Complaint, U.S. Bank purports to assert three distinct causes of action for breach of contract, although the claims significantly overlap and interrelate.  *First*, U.S. Bank seeks "specific performance" of CGMRC's purported obligation to repurchase both the Noticed and the Non-Noticed Loans, on the erroneous basis that CGMRC has "unequivocally indicated that it will not repurchase" the Noticed Loans and that "it is reasonable to expect that [CGMRC] will continue to refuse to repurchase most or all of the defective Mortgage Loans that are identified in the future."  (Compl. ¶¶ 62–63.)[6]  *Second*, U.S. Bank alleges that it is entitled to damages not limited to the repurchase remedy because CGMRC purportedly has breached the MLPA and PSA by "fail[ing] to cure or repurchase" the Noticed Loans.[7]  (Compl. ¶ 70.)  *Finally*, U.S. Bank asserts that CGMRC breached the MLPA and PSA by failing to notify the Trust of purported breaches in the Group II loan pool, thereby entitling the Trust both to have those defective mortgages repurchased, and damages.  (Compl. ¶ 80.)  For the reasons set forth below, U.S. Bank has failed to state a claim, and the Complaint should be dismissed with prejudice.

## ARGUMENT

## I.    U.S. BANK'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

In New York, the statute of limitations for breach of contract claims is six years. CPLR § 213(2).  Any such cause of action accrues on the date of the breach, regardless of when injury occurs or when the injured party becomes aware of the alleged harm.  *Structured Mortg. Trust 1997-2* v. *Daiwa Fin. Corp.*, No. 02 Civ. 3232, 2003 WL 548868, at *2 (S.D.N.Y. Feb. 25, 2003); *Nat'l Urban Ventures, Inc.* v. *City of Niagara Falls*, 910 N.Y.S.2d 615, 616 (App. Div.

---

[6]   All citations in the format "Compl. __" are to U.S. Bank's April 30, 2013 Complaint.

[7]   Exhibit 3 to the Complaint references only 1,263 of the 1,267 Noticed Loans.  (*See* Buergel Decl. ¶ 4.)  CGMRC assumes that the exclusion of the four mortgages is inadvertent.

2010).  New York law is clear that a breach of contract claim accrues, and the statute of

limitations period begins to run, at the time of the breach, not upon discovery of the breach.  *Ely-*

*Cruikshank Co.* v. *Bank of Montreal*, 615 N.E.2d 985, 986–87 (N.Y. 1993).  Because U.S. Bank

commenced this Action more than six years after the alleged breaches occurred, its claims should

be dismissed.

> **A.    U.S. Bank's Claims for Alleged Breaches of Representations
> and Warranties Are Barred by CPLR § 213(2)**

The first substantive paragraph of the PSA expressly provides that it "is dated

and effective as of April 1, 2007" (the "Effective Date"), (PSA at 1), with a defined closing date

of April 30, 2007 (the "Closing Date") (PSA § 1.01).  The PSA was executed alongside the

MLPA, which is "dated April 2, 2007," with a defined closing date of April 30, 2007.  (MLPA

at 1.)  Both agreements provide that the operative representations—the very representations that

U.S. Bank asserts were materially breached by CGMRC—were effective as of April 1, 2007, the

defined Effective Date.  (MLPA § 5(a); PSA § 2.01.)  Because U.S. Bank commenced this action

on April 30, 2013, more than six years after the Effective Date specified in the PSA and the

MLPA, U.S. Bank's claims are untimely and should be dismissed.

The inclusion of an "as of" date is unambiguous evidence of the parties' intent to

be bound from that date forward.  *Manns* v. *Norstar Bldg. Corp.*, 771 N.Y.S.2d 438, 439 (App.

Div. 2004); *Colello* v. *Colello*, 780 N.Y.S.2d 450, 452–53 (App. Div. 2004).  In this case, the

parties were bound by the loan-level representations and warranties "as of" the Effective Date

and claims for breaches of those representations and warranties accrued on that date.  This is true

even if the representations were made in connection with a future closing date.  *W. 90th Owners*

*Corp.* v. *Schlechter*, 525 N.Y.S.2d 33, 35–36 (App. Div. 1988); *Lana & Edward's Realty Corp.*

v. *Katz/Weinstein P'ship*, No. 27958/08, 2010 WL 963564, at *4 (N.Y. Sup. Ct. Kings Cnty.

2010).  New York courts consistently recognize that parties to a contract can, and often do, agree to be bound by an earlier date than a transaction's closing date, and that any such agreed-upon earlier date controls for the purposes of the statute of limitations.  *See Colello*, 780 N.Y.S.2d at 453 ("It is fundamental that where parties to an agreement expressly provide that a written contract be entered into 'as of' an earlier date than that on which it was executed, the agreement is effective retroactively 'as of' the earlier date and the parties are bound thereby accordingly.") (quoting *Matthews* v. *Jeremiah Burns, Inc.*, 129 N.Y.S.2d 841, 847 (Sup. Ct. N.Y. Cnty. 1954)); *Lana*, 2010 WL 963564, at *4 (dismissing as time barred contract claims filed on October 9, 2008, where contract was dated June 28, 2002 with a specified closing date of October 15, 2002, holding that the cause of action accrued on the June 28 "as of" date specified in the contract).

Presuming U.S. Bank's allegations to be true, the relevant representations and warranties were breached the moment that they became effective on April 1, 2007.  There are no allegations that any breaches of representations and warranties occurred after the Effective Date and certainly not after the contracts were signed on April 30, 2007; in fact, U.S. Bank expressly alleges that the loans in the securitization were not as warranted in the PSA, and by extension the MLPA, upon execution of the contracts. (*See* Compl. ¶¶ 43–49.)  Accordingly, CGMRC breached the contracts, if at all, at the time the parties agreed to be bound by the PSA, on its Effective Date.  The statute of limitations began to run at that time and expired six years later, on April 1, 2013, prior to the commencement of this litigation.  *See Lehman Bros. Holdings, Inc.* v. *Evergreen Moneysource Mortg. Co.*, 793 F. Supp. 2d 1189, 1193–94 (W.D. Wash. 2011) (applying New York law); *Structured Mortg. Trust 1997-2*, 2003 WL 548868, at *2–3.  For this reason, U.S. Bank's breach of contract claims are untimely and should be dismissed.

B.    **The Alleged Breach of the Repurchase Protocol
       Does Not Extend the Limitations Period**

In its Complaint, U.S. Bank in essence alleges two distinct breaches.  As discussed above, the first alleged breach—of the representations and warranties in the PSA— occurred on April 1, 2007, the Effective Date of the PSA and the date when CGMRC made those representations, more than six years before the Complaint was filed.  In an attempt to avoid the dismissal of its claims as untimely, U.S. Bank asserts that CGMRC committed a second breach, purportedly by refusing to repurchase the Noticed Loans at the time U.S. Bank made its demand. (*See* Compl. ¶¶ 50–55.)  U.S. Bank's efforts to evade the applicable statute of limitations, however, are unavailing:  CGMRC's second purported breach is nothing more than a purported failure of CGMRC to cure its first—and only—alleged breach.  New York law is clear that a failure to cure does not give rise to a separate and distinct claim for breach of contract.

Specifically, a cause of action accrues when the party making the claim has a legal right to demand payment.  *Lehman Bros. Holdings, Inc.*, 793 F. Supp. 2d at 1193–94. Assuming the truth of the allegations in the Complaint, U.S. Bank had a legal right to demand payment immediately when CGMRC made the allegedly false representations and warranties.  In fact, the Complaint repeatedly states that CGMRC knowingly sold defective mortgages to the Trust at the time of the formation of the Trust; as expressly set forth in the PSA, those representations were made as of the Effective Date, not at any future time, and not when CGMRC purportedly refused U.S. Bank's repurchase demand.[8]  Thus, those representations

---

[8]    Notably, U.S. Bank is a party to other securitization contracts that include accrual-at-denial language that is expressly absent from the MLPA and PSA at issue here.  (*See, e.g.,* Buergel Exs. 6A–10B.)  Its absence from the PSA and MLPA—contracts that were negotiated at arms-length, between sophisticated commercial parties—is further evidence that the parties intended for U.S. Bank's claims to accrue as of the Effective Date of the representations and warranties.  *See Kinkopf* v. *Triborough Bridge & Tunnel Auth.*, 764 N.Y.S.2d 549, 556 (N.Y. City Civ. Ct. 2003) (holding that the six year statute of limitations applied where the drafters

were breached, if at all, as of the Effective Date.

This precise issue recently was addressed by Justice Sherwood in *Nomura Asset Accept. Corp. Alt. Loan Trust, Series 2005-S4* v. *Nomura Credit & Capital, Inc.*, No. 653541/2011, 2013 WL 2072817 (N.Y. Sup. Ct. N.Y. Cnty. May 10, 2013).  Specifically, Justice Sherwood rejected the trustee's efforts in *Nomura* to advance an "accrual at denial" theory, holding that permitting such a claim would allow the plaintiff "to essentially circumvent the statute of limitations by indefinitely deferring its demand for payment."  *Id.* at *8, *quoting Lehman Bros. Holdings, Inc.*, 793 F. Supp. 2d at 1194.

The holding in *Nomura* is consistent with New York law, which clearly provides that the statute of limitations is triggered not when a party makes a demand for payment, but rather at the moment in time when the party has a right to demand payment; in other words, the statute of limitations begins to run upon breach, not upon a demand for payment related to the breach.  *See, e.g., Hahn Auto. Warehouse, Inc.* v. *Am. Zurich Ins. Co.*, 967 N.E.2d 1187, 1190–91 (N.Y. 2012) (insurer's demands for payment in relation to invoices over six years old deemed untimely, as obligation to pay arose at the time insurance contracts were entered, not when the invoices relating to the policies were transmitted); *Structured Mortg. Trust 1997-2*, 2003 WL 548868, at *2–3 (rejecting plaintiff's argument that delaying demand for payment in relation to a mortgage repurchase claim tolled the statute of limitations).[9]

---

of the contract could have used language to change the limitations period but did not), *rev'd on other grounds*, 792 N.Y.S.2d 291 (App. Term 2004).

[9]   In contrast to *Hahn*, *Daiwa*, *Evergreen*, and *Nomura*, Justice Kornreich recently held that a similar repurchase claim did not accrue until the defendant refused to repurchase an allegedly defective loan.  *ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2* v. *DB Structured Prods., Inc.*, 965 N.Y.S.2d 844, 848–49 (Sup. Ct. N.Y. Cnty. 2013).  In so holding, Justice Kornreich relied on *Cont'l Cas. Co.* v. *Stronghold Ins. Co.*, 77 F.3d 16 (2d Cir. 1996), a case that was expressly rejected in *Hahn*.  967 N.E.2d at 1191 n.5.

## II.   U.S. BANK HAS FAILED TO PLEAD ALLEGATIONS SUFFICIENT TO SUPPORT ITS BREACH OF CONTRACT CLAIMS

### A.   U.S. Bank's Allegations Sound in Fraud

Lacking a sufficient factual basis to support its contract claims, U.S. Bank essentially alleges—albeit in conclusory fashion—that CGMRC's securitization of mortgages into the Trust constituted a fraudulent scheme designed to generate revenue for CGMRC at the expense of unwitting investors.  U.S. Bank's allegations, however—which sound in fraud—are insufficient to state a claim under Federal Rule of Civil Procedure 9(b).

The Rule 9(b) heightened pleading standard applies not just to claims of fraud, but also to any claim based on factual allegations of fraud:

> [T]he heightened pleading standard of Rule 9(b) applies to . . . claims insofar as the claims are premised on allegations of fraud.  By its terms, Rule 9(b) applies to 'all averments of fraud.'  Fed. R. Civ. P. 9(b).  This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action.

*Rombach* v. *Chang*, 355 F.3d 164, 171 (2d Cir. 2004).  In *Rombach*, the Second Circuit held that allegations of "inaccurate *and* misleading" statements, "*untrue* statements of material facts" and "materially *false* and *misleading* written statements" sounded in fraud and thus were subject to Rule 9(b). *Id.* at 172 (emphasis in original); *see also In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 285 (S.D.N.Y. 2001) (allegations that defendant "knew, or should have known" of risks, "consciously ignored and understated" risks, and "intended to create in the minds of the consuming public the false sense" of safety, sound in fraud).  Courts in this Circuit repeatedly have held that Rule 9(b) applies to claims for breach of contract that rely on allegations of fraud. *See, e.g., Frota* v. *Prudential-Bache Sec., Inc.*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986) ("Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty— statutory, common law, tort, *contractual*, or fiduciary.") (emphasis added); *accord DeBlasio* v.

*Merrill Lynch & Co.*, No. 07 Civ. 318, 2009 WL 2242605, at *10–12 (S.D.N.Y. July 27, 2009)

(citing *Frota* and *Rombach* and applying Rule 9(b) to a breach of contract claim).

      Rule 9(b) clearly applies.  Throughout the Complaint, U.S. Bank alleges that

CGMRC deliberately securitized large numbers of loans that it knew were in breach of the

applicable representations and warranties.  Among other allegations, U.S. Bank asserts that (i)

"[CGMRC] discovered the vast extent of breaches in the Group II Mortgage Loans at the time it

made its representations and warranties," (Compl. ¶ 43); (ii) "[CGMRC] knowingly securitized

31 percent of those defective loans," (*id.* ¶ 4); (iii) "[CGMRC] knew at the time that it was

highly likely that more than one out of every eight loans it securitized between January 2006 and

June 2007 did not comply with the applicable underwriting guidelines," (*id.* ¶ 47); and (iv) "a

sponsor that intended in good faith to abide by its repurchase obligation would never securitize—

and would take steps to insure it did not securitize—a pool of mortgage loans rife with violations

of representations and warranties," *(id.* ¶ 34).[10]  U.S. Bank further alleges that CGMRC engaged

in dilatory tactics and deliberately refused to honor its contractual obligations.[11]  (*See id.* ¶ 51.)

      Nonetheless, the Complaint entirely fails to satisfy Rule 9(b)'s heightened

pleading requirement as to the allegations of fraud on which the causes of action depend.  To

meet the relevant standard, "the complaint must: (1) specify the statements that the plaintiff

contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were

---

[10]  *See also* Compl. at 20 ("CITIGROUP KNEW OF MATERIAL BREACHES PRIOR TO MAKING THE REPRESENTATIONS AND WARRANTIES"); *id.* ¶¶ 8, 17, 31–33 (detailing CGMRC's alleged profit motive for securitizing defective loans in the Trust); *id.* ¶¶ 1, 7-8, 22 n.4, 24, 39–41 (detailing CGMRC's alleged intent to induce reliance by investors and rating agencies).

[11]  Of particular note, U.S. Bank complains that CGMRC has acted in bad faith by requesting an opportunity to review the documents that form the basis of U.S. Bank's repurchase claims for the Noticed Loans.  Surprisingly, U.S. Bank asserts that those documents are irrelevant to its claims—even though it is the review of those very documents that purportedly led U.S. Bank to file the Complaint.  (*See* Compl. ¶¶ 35–37.)

made, and (4) explain why the statements were fraudulent." *Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (citation omitted).  Because the Complaint alleges only in conclusory fashion that CGMRC knowingly securitized breaching loans and is now deliberately refusing to honor its contractual obligations—without specifying the who, what, when or where relating to the purportedly fraudulent conduct—the Complaint fails to satisfy the requirements of Rule 9(b), and therefore should be dismissed.

### B.   U.S. Bank Has Failed to Plead Any Factual Basis for its Breach of Contract Claims Related to the Non-Noticed Loans

U.S. Bank's allegations concerning the Non-Noticed Loans, which are the subject of U.S. Bank's first cause of action in part and its third cause of action, are entirely conclusory and lacking in any sufficient factual basis to survive dismissal.  Specifically, U.S. Bank asserts as a generalized matter that over an 18 month period, CGMRC purportedly was informed by a due diligence provider that 42% of the loans that provider reviewed did not meet the relevant representations, but that CGMRC nonetheless securitized nearly one third of those loans. (Compl. ¶ 47.)  Importantly, however, U.S. Bank fails to specify whether any of these alleged waivers occurred with respect to the mortgages in the Trust—or even whether the due diligence provider identified in the Complaint was engaged by CGMRC to conduct due diligence with respect to the loans included in the Trust.  In fact, in the Complaint, U.S. Bank goes so far as to admit that it is merely speculating as to whether the purported practices it describes apply to the loans in the Trust:  "It is, at the very least, reasonably plausible that [CGMRC] conducted due diligence on the [Non-Noticed Loans] in a manner consistent with the due diligence it conducted on other mortgage pools examined during the same time period . . . ."  (Compl. ¶ 48.)

In other words, U.S. Bank has failed to identify a single Non-Noticed Loan that CGMRC or its due diligence vendor specifically identified as out of compliance with the

applicable underwriting guidelines, nor has it identified a single fraudulent statement concerning

the Non-Noticed Loans—much less the person(s) who made that statement and the time and

place when the statement was made.  Mere speculation—to which U.S. Bank admits—that Non-

Noticed Loans suffer from the same purported defects as some other, unrelated group of loans is

insufficient to state a claim with respect to the Non-Noticed Loans, particularly under Rule 9(b).

*See Landesbank Baden-Württemberg* v. *Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 621–23

(S.D.N.Y. 2011) (generalized allegations concerning the Clayton report and defendants' access

to loan-level information are insufficient to meet the requirements of Rule 9(b)).

### C.     U.S. Bank's Allegations as to the Noticed Loans Are Similarly Deficient

U.S. Bank's allegations related to the Noticed Loans, although purportedly based

on a review of the relevant loan files in comparison to the applicable guidelines, similarly are

insufficient to state a claim under Rule 9(b).  Specifically, U.S. Bank relies upon the results of

"[a] full forensic review" to support its claims as to the breach of representations justifying the

repurchase of 1,267 separate loans at a cost of over $348 million. (*See* Compl. ¶¶ 36–37, Ex. 3.)

U.S. Bank, however, fails to allege the necessary specifics related to that review:  the review

purportedly was (i) initiated (and presumably paid for) by "certain Certificateholders" that

remain unnamed and unidentified in the Complaint, (ii) conducted by an unnamed person or

persons, (iii) who may or may not have experience with the underwriting of mortgage loans, (iv)

based on what may or may not be complete and accurate loan files, origination records, and

underwriting guidelines.  (*See* Compl. ¶¶ 35, 36.)  U.S. Bank's allegations are insufficient under

Rule 9(b) to plead material breaches of representations with particularity as to the 1,267 Noticed

Loans, representing an aggregate balance of $348 million.  U.S. Bank's claims with respect to the Noticed Loans should be dismissed.[12]

## III.  U.S. BANK'S REMEDIES ARE LIMITED TO THE AGREED-UPON REPURCHASE PROTOCOL

To the extent U.S. Bank seeks relief other than the relief expressly provided for in the contracts, such claims should be dismissed.  First, with respect to the Noticed Loans, U.S. Bank cannot evade the repurchase protocol set forth in the contract by seeking damages in relation to a purportedly separate cause of action for breach of that protocol.  Second, with respect to the Non-Noticed Loans, U.S. Bank's claims demanding repurchase fail both because they seek relief outside of the agreed-upon contractual repurchase protocol and because they are unripe.  Third, U.S. Bank has failed to identify any contractual provision that requires CGMRC to repurchase mortgages that have been liquidated for the benefit of the Trust.  Finally, U.S. Bank's indemnification claim fails because the contracts do not state a clear intent to allow for first-party indemnification.

### A.  U.S. Bank Cannot Assert an Independent Cause of Action for CGMRC's Purported Failure to Repurchase

Although the Complaint's claims are overlapping and difficult to distinguish, U.S. Bank's second cause of action alleges that CGMRC breached its obligations under the PSA and MLPA by "fail[ing] to cure or repurchase any Mortgage Loans identified in the Breach Notice" and seeks damages based on this purported "breach."  (Compl. ¶¶ 70–72.)  The repurchase

---

[12]  In addition to its generalized allegations, the Complaint purports to describe the specific factual bases for its claims of breach as to *four* mortgages, which in total account for *less than two hundredths of a percent* of the Noticed Loans that purportedly suffer from breaches of the applicable representations and warranties.  Those four loans, identified in paragraph 42 of the Complaint, account for $632,005 in original principal balance.  *See* Compl. Ex. 3 (The balance for "Loan xxxx8308" was not included in Exhibit 3, although U.S. Bank previously has represented it to be $119,162.).

protocol set forth in the PSA and MLPA, however, provides nothing more than a remedy—and thus cannot form the basis of an independent claim for breach of contract claim.  Moreover, even if such a cause of action did exist, CGMRC would not be in breach of its obligations, as it never refused to repurchase the loans at issue.

The parties—sophisticated commercial parties with experience negotiating similar agreements—agreed that the repurchase protocol would be the "sole remed[y]" available for breaches of any representations or warranties set forth in the MLPA.  (*See* MLPA § 6; PSA § 2.03(a).)  Specifically, Section 6 of the MLPA provides that "(i) the obligations of [CGMRC] . . . to cure, repurchase and substitute for a defective Mortgage Loan and (ii) the obligations of [CGMRC to indemnify where provided for] constitute the *sole remedies* of the Purchaser respecting . . . a breach of the representations and warranties."  (Emphasis added.)  Similarly, Section 2.03 of the PSA expressly states that repurchase, substitution, or cure "shall constitute the only *remedies* respecting such omission, defect or breach available to the Trustee . . . on behalf of the Certificateholders."  (Emphasis added.)  The contracts further provide a specific protocol pursuant to which CGMRC, within 90 days of discovery or notice of the breach, must (i) cure the defect, (ii) repurchase the loan, or (iii) substitute a qualifying loan.

Nonetheless, U.S. Bank ignores the plain language of the MLPA and the PSA that describes the repurchase mechanism as a "remedy," instead asserting that CGMRC would be in breach of the relevant agreements any time that it refuses to repurchase a loan where U.S. Bank and CGMRC disagree about whether the loan should be repurchased.  As discussed above, however, New York law is clear that a repurchase protocol like that specified in the PSA and MLPA operates as a remedy and does not provide an independent ground for a breach of contract claim.  *Walnut Place LLC*  v. *Countrywide Home Loans, Inc.*, 948 N.Y.S.2d 580, 581 (App. Div.

2012) (repurchase provision "merely provides for a remedy in the event of a breach"); *Assured Guar. Corp.* v. *EMC Mortg., LLC*, No. 650805/2012, 2013 WL 1442177, at *4–5 (N.Y. Sup. Ct. N.Y. Cnty. Apr. 4, 2013) (plaintiff's claims which are "relate[d] to, and overlap with, [breaches of] the Loan Warranties . . . are specifically subject to the Repurchase Protocol"); *see also Assured Guar. Mun. Corp.* v. *Flagstar Bank, FSB*, No. 11 Civ. 2375, 2011 WL 5335566, at *5 (S.D.N.Y. Oct. 31, 2011).

Even if such a claim for damages—as opposed to repurchase—does exist, U.S. Bank's second cause of action still fails, as CGMRC has not failed to honor its repurchase obligations. If anything, U.S. Bank's actions have hindered CGMRC and obstructed the performance of its duties.

Specifically, U.S. Bank alleges that CGMRC has repudiated its contractual obligation to repurchase breaching loans, and that this repudiation justifies the request for a remedy outside of the repurchase protocol. (Compl. ¶¶ 62, 71.) U.S. Bank is wrong. New York law requires an "overt communication of intention not to perform" that is "positive and unequivocal" in order to demonstrate repudiation of a contract. *Tenavision, Inc.* v. *Neuman*, 379 N.E.2d 1166, 1168 (N.Y. 1978) (internal quotation omitted); *De Lorenzo* v. *Bac Agency Inc.*, 681 N.Y.S.2d 846, 848 (App. Div. 1998) (the repudiating party must have indicated "an unqualified and clear refusal to perform"). The only communication identified by U.S. Bank as purportedly constituting the requisite repudiation is CGMRC's January 31 Letter. (*See* Compl. ¶¶ 50–51.) Nowhere in that letter, however, does CGMRC state or suggest that it did not intend to honor its contractual obligations. In fact, the January 31 Letter makes clear the opposite: CGMRC specifically requested information necessary for it to evaluate its obligations with respect to U.S. Bank's demand for the repurchase of specified loans. (*See* Buergel Ex. 5 (stating that CGMRC

is "reviewing the issues raised" by U.S. Bank but needs information "to evaluate its position with respect to the Subject Loans and determine what action, if any, CGMRC is obligated to take with respect to each Subject Loan.").)  Nothing in the January 31 Letter constitutes a "positive and unequivocal" indication of an intention not to perform.

CGMRC's good faith request for additional information came within three days of CGMRC receiving U.S. Bank's notification of the alleged breaches.  U.S. Bank never responded to CGMRC's letter.  In essence, by bringing this action and asserting that CGMRC breached its repurchase obligations, U.S. Bank is asserting that CGMRC should blindly incur hundreds of millions of dollars of repurchase liability without the benefit of, or opportunity to review, the evidence substantiating the claims.  Rather than engaging in a dialogue with CGMRC or providing basic information to support its $348 million claim, U.S. Bank waited until it could claim that CGMRC had surpassed the 90-day deadline, and proceeded to file this lawsuit.  U.S. Bank cannot stonewall CGMRC's attempt to evaluate its obligations under the contracts and then turn around and accuse CGMRC of breaching those obligations.  *See Chemical Bank* v. *Stahl*, 712 N.Y.S.2d 452, 462 (App. Div. 2000) (stating that contracts have "an implied covenant not to prevent and to reasonably cooperate with the [counterparty's] performance of its [contractual] obligations").

Because the agreements provide that U.S. Bank's sole remedy in relation to materially defective loans is to seek the cure of the breach or the repurchase of those loans—and because U.S. Bank has frustrated CGMRC's good faith attempts to evaluate its purported obligations to cure the breach or repurchase the Noticed Loans—U.S. Bank's second cause of action, for a purported breach of CGMRC's repurchase obligations with respect to the Noticed Loans, should be dismissed.

### B.     U.S. Bank Is Not Entitled to Equitable Relief in Relation
### to Unidentified and Unspecified Additional Claims

Through its Complaint, U.S. Bank seeks not only to have CGMRC repurchase loans that U.S. Bank purportedly has reviewed and identified as containing material breaches of the applicable representations, but also the Non-Noticed Loans, which may or may not have any breaches of representations, which U.S. Bank may or may not identify in the future.  (Compl. ¶ 65.)  Thus, in other words, U.S. Bank requests that this Court order relief as to mortgage loans that are not yet actually in controversy; loans for which no breach has been asserted by U.S. Bank, and as to which CGMRC has not denied a repurchase demand.  U.S. Bank's claims seeking such relief should be dismissed both because such claims constitute an improper attempt to do an end run around the exclusive and contractually-required repurchase protocol to which both parties agreed as the sole available remedy and because such claims are unripe.

As discussed above, the relevant agreements expressly provide that repurchase is the "sole" remedy available to the Trust relating to materially defective loans.  *See supra* Part III.A.   Notwithstanding these express provisions, U.S. Bank demands that the Court order CGMRC to repurchase some as-yet unidentified set of loans before CGMRC has been provided notice of any alleged breach, before the 90 day period has run, before CGMRC has had any opportunity to dispute the existence of a breach, and before CGMRC has had the opportunity to cure defects where possible.  U.S. Bank's claims seeking repurchase of the Non-Noticed loans should be dismissed as unauthorized under the terms of the parties' express agreement.  *See Assured* v. *EMC*, 2013 WL 1442177, at *4 (interpreting similar contractual language to hold that the agreements preclude remedies other than those provided for in the repurchase protocol); *MASTR Asset Backed Sec. Trust 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n* v. *WMC Mortg. Corp.*, 843 F. Supp. 2d 996, 1001 (D. Minn. 2012) (same).

Moreover, and in any event, U.S. Bank's claims seeking equitable relief as to loans to be identified in the future, whether styled as a claim for specific performance or declaratory judgment, are unripe. There is no actual controversy for the Court to resolve as to such hypothetical loans. Such a controversy would arise only after CGMRC is given notice of a purported breach and an opportunity to cure. *See MASTR 2006-HE3*, 843 F. Supp. 2d at 1000 (holding that "claims arising out of other loans, for which [plaintiff] has yet to give [defendants] notice and an opportunity to cure, are not yet ripe"). Because CGMRC has not repudiated the PSA and because, in all events, any such claims are unripe, U.S. Bank's claims seeking the repurchase of the Non-Noticed Loans should be dismissed.

### C.     U.S. Bank Cannot Enforce an Obligation to Repurchase Mortgages That No Longer Exist

U.S. Bank's Complaint improperly demands that CGMRC repurchase mortgage loans that no longer exist because they have been liquidated—relief that specifically is foreclosed by the parties' express agreement. (Compl ¶ 52.) Indeed, in making this demand, U.S. Bank notably fails to cite to any provision of the PSA that makes available such relief— choosing instead to rely on vague allegations regarding "industry practice." (Compl. ¶ 53.) Importantly, U.S. Bank itself is responsible for the position in which it finds itself: U.S. Bank alone has determined to recoup whatever funds it could through the foreclosure and liquidation of defaulted mortgages. Having made this election, U.S. Bank cannot now evade the requirements of the PSA by demanding that CGMRC repurchase assets that have ceased to exist because of U.S. Bank's own actions.

### 1.     The Agreements Expressly Provide for the Repurchase of *Mortgages*.

The express terms of the PSA's repurchase protocol set forth in detail CGMRC's obligation with respect to loans that are shown to suffer from a material defect. The PSA first

states that U.S. Bank "shall enforce the obligations of [CGMRC] under the [MLPA] . . . to repurchase such Mortgage Loan from [the Trust] at the Purchase Price . . . ."  (PSA § 2.03(a).)  The "Purchase Price" is defined alternatively with respect to two types of assets that CGMRC may be required to repurchase: Mortgage Loans and REO Properties.  (*See id.* § 1.01 (defining Purchase Price "[w]ith respect to any Mortgage Loan or REO Property to be purchased pursuant to or as contemplated by Section 2.03 or Section 9.01").)[13]  By its plain terms, the PSA expressly contemplates the repurchase of assets from the Trust only in two scenarios: repurchases of Mortgage Loans in the case of material breaches of representations and warranties per Section 2.03, and repurchases of Mortgage Loans and REO Properties in case of the termination of the Trust per Section 9.01, which is inapplicable here.  There is no applicable provision in the PSA that requires CGMRC to repurchase mortgages that no longer exist.

Other provisions of the PSA compel the same result.  The remainder of Section 2.03(a) sets forth specific procedures for repurchases, noting that CGMRC is required to deposit the Purchase Price with the Servicer, and U.S. Bank and other parties are required to effectuate the transfer of ownership of the mortgage from the Trust to CGMRC upon repurchase.  Likewise, the Purchase Price for a mortgage to be repurchased is the sum of the Stated Principal Balance of the mortgage and accrued interest on that Stated Principal Balance as of the date of the repurchase, along with certain servicing expenses.  (*See id.* § 1.01.)  According to the PSA, the Stated Principal Balance of a mortgage that has been liquidated is zero.  (*See id.* (clause (b) of the definition of "Stated Principal Balance").)

---

[13]   Section 9.01 of the PSA provides the Servicer with the option to purchase all of the remaining assets, specifically the "Mortgage Loans and each related REO Property remaining in" the Trust, once the outstanding balances of the mortgages reach a certain threshold.  REO Properties are "[m]ortgaged propert[ies] acquired by the Servicer on behalf of the Trust Fund through foreclosure or deed-in-lieu of foreclosure . . . ."  PSA § 1.01.

Read together, these provisions compel an absurd result in the context of U.S. Bank's claims:  in essence, U.S. Bank seeks to require CGMRC to repurchase non-existent loans at a defined Purchase Price of zero.  To the extent that U.S. Bank's claims seek the repurchase of liquidated loans, those claims should be dismissed.[14]  *See MASTR Asset Backed Sec. Trust 2006-HE3* v. *WMC Mortg. Corp.*, No. 11 Civ. 2542, 2012 WL 4511065, at *5–6 & n.9 (D. Minn. Oct. 1, 2012).

2.       The Trust Opted to Recoup Funds from the Liquidation of Mortgages in Lieu of Pursuing Repurchase Claims.

Despite the Complaint's allegations to the contrary, this plain reading of the PSA does not lead to a Hobson's choice for the Trust:  either pursue repurchase claims and delay recovery for the Trust, or pursue foreclosure and forgo the repurchase remedy.[15]

By proceeding with the liquidation of mortgages prior to and without providing notice to CGMRC of its potential repurchase claims related to those mortgages, the Trust assumed the risk that any recoveries obtained through liquidation would be insufficient to cover any loss from default.  In effect, the Trust elected its remedy and now cannot rewrite the express terms of the PSA in an effort to recoup those shortfalls.

**D.     U.S. Bank Is Not Entitled to Indemnification from CGMRC**

In its Prayer for Relief, U.S. Bank requests "[a]ll costs of the Trusts associated with this action (including the Trustee's attorneys' fees)."  (Compl. at 30.)  In support of this

---

[14]   U.S. Bank has failed to specify whether any of the 1,267 Noticed Loans in fact have been liquidated.  Nonetheless, to the extent that any of these loans—or any other loans in the Trust for which U.S. Bank is demanding repurchase now or "in the future"—have been or are liquidated, CGMRC submits that U.S. Bank's demand for repurchase with respect to such liquidated loans should be dismissed with prejudice.  (*See* Compl. ¶ 65.)

[15]   Of course, to the extent the express terms of the PSA lead to such a result, U.S. Bank—a sophisticated party with deep experience serving as a trustee in mortgage securitization transactions—knowingly assumed this risk by agreeing to its terms.

demand, U.S. Bank appears to rely solely on Section 6 of the MLPA, which requires CGMRC to "indemnify the [Depositor, and by operation of Section 2.03 of the PSA, the Trust] and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgment, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach of the representations and warranties contained in Section 5 of [the MLPA]." (*See* Compl. ¶ 29.) However, because this language does not satisfy the standard under New York law for first-party indemnification, U.S. Bank's demand should be denied.

Under well-settled New York law, the default presumption is that indemnification clauses apply only to disputes with third parties, as opposed to disputes between the parties to the contract. *See Atlantic Richfield Co.* v. *Interstate Oil Transp. Co.*, 784 F.2d 106, 115 (2d Cir. 1986) ("[I]ndemnity agreements are generally designed only to protect against liability for damage to third parties."). For this reason, courts require that the relevant contractual language be "unmistakably clear" before interpreting indemnification clauses to apply to disputes between parties to the contract. *BNP Paribas Mortg. Corp.* v. *Bank of Am., N.A.*, 778 F. Supp. 2d 375, 415 (S.D.N.Y. 2011) ("[I]ndemnification clauses are not construed to cover first-party claims unless the contract makes it unmistakably clear that the parties intended so to provide. . . . Unless the indemnification clause refers exclusively or unequivocally to claims between the indemnitor and indemnitee, the court must find the agreement to be lacking evidence of the required intent to cover such claims.") (internal quotations and citations omitted).

The indemnification clause here does not come close to satisfying this "unmistakably clear" standard. Nothing in the language of Section 6 of the MLPA makes reference to or clearly implies an intent to provide for first-party indemnification, as other courts

have held in interpreting similar indemnification clauses at issue in other RMBS repurchase litigations. *Bear Stearns Mortg. Funding Trust 2007-AR2* v. *EMC Mortg. LLC*, No. 6861-CS 2013 WL 164098, at *2 (Del. Ch. Jan. 15, 2013); *see also Assured* v. *Flagstar*, 2011 WL 5335566, at *5. The same result is merited here: U.S. Bank's claim seeking indemnification in the form of payment for its costs and expenses should be denied.

### CONCLUSION

For these reasons, CGMRC respectfully requests that the Court dismiss the Complaint in its entirety and with prejudice.

Dated:     New York, New York
           July 17, 2013

                              Respectfully submitted,

                              PAUL, WEISS, RIFKIND, WHARTON &
                                GARRISON LLP

                              By:            /s/ Susanna M. Buergel

                              Brad S. Karp
                              Bruce Birenboim
                              Susanna M. Buergel
                              Kevin P. O'Keefe
                              1285 Avenue of the Americas
                              New York, New York 10019
                              (212) 373-3000
                              bkarp@paulweiss.com
                              bbirenboim@paulweiss.com
                              sbuergel@paulweiss.com
                              kokeefe@paulweiss.com

                              *Attorneys for Defendant Citigroup Global
                                Markets Realty Corp.*

25